194 F.3d 130 (D.C. Cir. 1999)
 Natural Resources Defense Council, Inc.,Petitioner
v.
Environmental Protection Agency and Carol M. Browner, Administrator, Respondents
Chemical Manufacturers Association, et al., Intervenors
 No. 97-1727 Consolidated with 97-1732
 United States Court of Appeals
FOR THE DISTRICT OF COLUMBIA CIRCUIT
 Argued September 9, 1999
Decided October 29, 1999
 
 [Copyrighted Material Omitted]
 On Petitions for Review of an Order of the Environmental Protection Agency
 Andrew P. Caputo argued the cause for petitioner Natural Resources Defense Council, Inc. With him on the briefs was David G. Hawkins.
 Lauren E. Freeman argued the cause for petitioners Appalachian Power Co., et al. With her on the briefs was Henry V. Nickel.
 Scott J. Jordan, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the briefs were Lois J. Schiffer, Assistant Attorney General, and Cecilia E. Kim, Attorney.
 Leslie Sue Ritts, Ellen Siegler, Henry V. Nickel, Lauren E. Freeman, Jerome H. Heckman, Peter L. de la Cruz, William H. Lewis, Michael A. McCord, Charles H. Lockwood, II, John Reese, G. William Frick, David F. Zoll and Alexandra Dunn were on the brief of Industry Intervenors in support of respondent. K. D. Grant entered an appearance.
 Before: Ginsburg, Sentelle and Garland, Circuit Judges.
 Opinion for the Court filed by Circuit Judge Sentelle.
 Sentelle, Circuit Judge:
 
 
 1
 Natural Resources Defense Council, Inc. ("NRDC") challenges the Environmental Protection Agency's enhanced emission source monitoring rule, known as Compliance Assurance Monitoring, promulgated pursuant to the 1990 Clean Air Act Amendments. Various industry groups challenge EPA's "any other material information" certification requirement which pertains to collecting evidence to prove or disprove Clean Air Act compliance. After considering the parties' arguments and reviewing the record, we hold that EPA's enhanced monitoring system complies with the Clean Air Act Amendments except for the portion pertaining to "continuous or intermittent" compliance certification. We also hold that the issue raised by the industry groups is unripe for review.
 
 I. Background
 A. Enhanced Monitoring
 
 2
 Section 114(a) of the Clean Air Act vests EPA with the authority to require emissions data collection in order to enable the agency to develop emissions standards and determine compliance with those standards. See 42 U.S.C. § 7414(a) (1994). The Clean Air Act also provides EPA with the authority to enforce those standards. See 42 U.S.C. § 7413. Prior to 1990, most air pollution sources' emissions were tested at start-up or another single point in time. See Enhanced Monitoring Program, 58 Fed. Reg. 54,648, 54,658 (1993) (proposed Oct. 22, 1993). At that time, there was no statutory mechanism outside of EPA, state regulators, and citizen surveillance to ensure the requisite compliance monitoring. See id. In 1990, Congress enacted amendments to the Clean Air Act intended to enhance emissions source monitoring and compliance and to impose new monitoring and reporting requirements on emissions sources. Specifically, the new amendments sought to identify and clarify the kinds of data to be collected and to require major sources to monitor their emissions and report their results to EPA.
 
 
 3
 As amended, § 114 of the Clean Air Act provides in part:
 
 
 4
 [T]he [EPA] Administrator may require any person who owns or operates any emission source, who manufactures emission control equipment or process equipment, who the Administrator believes may have information necessary for the purposes set forth in this subsection, or who is subject to any requirement of this chapter ... on a one-time, periodic or continuous basis to ... (D) sample such emissions (in accordance with such procedures or methods, at such locations, at such intervals, during such periods and in such a manner as the Administrator shall prescribe) [and] (E) keep records on control equipment parameters, production variables or other indirect data when direct monitoring of emissions is impractical....
 
 
 5
 42 U.S.C. § 7414(a)(1)(D)-(E) (emphasis added). This provision gives EPA the authority to require a source to keep relevant emissions data when direct sampling is impractical and to require a source to conduct emission sampling. Congress added a new subsection in 1990 pertaining to major source monitoring, stating that EPA
 
 
 6
 shall in the case of any person which is the owner or operator of a major stationary source, and may, in the case of any other person, require enhanced monitoring and submission of compliance certifications. Compliance certification shall include ...
 
 
 7
 (C) the [source's] compliance status,
 
 
 8
 (D) whether compliance is continuous or intermittent,[and]
 
 
 9
 (E) such other facts as the Administrator may require.
 
 
 10
 Id. § 7414(a)(3) (emphasis added). Thus, Congress expressed an intention to obligate major sources to a more stringent reporting standard.
 
 
 11
 Section 504 of the Clean Air Act establishes the major source permitting program's requirements and contains provisions related to monitoring and compliance certification. Section 504(a) requires that each permit "shall include enforceable emission limitations and standards ... and such other conditions as are necessary to assure compliance with applicable requirements." 42 U.S.C. § 7661c(a). Subsection (b) elaborates that "[t]he Administrator may by rule prescribe procedures and methods for determining compliance and for monitoring and analysis of pollutants regulated under this chapter, but continuous emissions monitoring need not be required if alternative methods are available that provide sufficiently reliable and timely information for determining compliance." Id. § 7661c(b). Thus, § 504 establishes that EPA may promulgate rules that require implementing a compliance and monitoring method which provides "sufficiently reliable" information for determining compliance.
 
 
 12
 In 1993, EPA proposed a broad regulatory scheme that would have required a major source to provide an emissions compliance statement and proof of continuous compliance. The proposal would have resulted in direct emissions monitoring in most instances. However, following public comment sessions, EPA decided to adopt an alternative approach in 1997. EPA abandoned the more rigorous 1993 proposal in response to industry and state and local pollution control agencies' comments that the proposal was too costly given the benefits involved, too burdensome on local permitting authorities, inconsistent with congressional intent regarding costs, and likely to stifle innovation due to high costs. See Compliance Assurance Monitoring Rule making (40 C.F.R. Parts 64, 70, and 71), Responses to Public Comments (Part I) (October 2, 1997).
 
 
 13
 EPA ultimately adopted a new approach, Compliance Assurance Monitoring ("CAM"), which requires major sources using pollution control devices to employ parametric monitoring. See 40 C.F.R. §§ 64.2, 64.3(a) (1998). The CAM program allows major sources to comply with monitoring requirements by identifying specific operational parameters and providing data that enforcement entities can use to determine whether the source falls within the appropriate operating range.
 
 
 14
 Under CAM, EPA requires that major source owners "establish ... appropriate range(s) ... for the selected indicator(s) such that operation within the ranges provides a reasonable assurance of ongoing compliance with emission limitations or standards." 40 C.F.R. § 64.3(a)(2). CAM also imposes an affirmative requirement on each major source to bring its emissions within the acceptable range when the source falls outside the acceptable range. See 40 C.F.R. § 64.7(d). Specifically, the source must "restore operation of the pollutant-specific emissions unit (including the control device and associated capture system) to its normal or ususal manner of operation as expeditiously as practicable...." Id. CAM expands upon prior emissions monitoring by providing major sources with a mechanism to implement self monitoring and self-checks on compliance. For reasons set forth more fully below, NRDC challenges the adequacy of EPA's attempt to comply with the Clean Air Act Amendments.
 
 
 15
 B. Other Material Information and Credible Evidence
 
 
 16
 To comport with the CAM approach, EPA amended its Part 70/71 major source permit compliance requirements.Under the revision, each major source must identify its compliance methodology and identify whether that methodology provides continuous or intermittent data. See 40 C.F.R. §§ 70.6(c)(5)(iii)(B), 71.6(c)(5)(iii)(B). The revision also requires major sources "if necessary, ... [to] identify any other material information that must be included in the certification to comply with section 113(c)(2) of the Act, which prohibits knowingly making a false certification or omitting material information." Id. §§ 70.6(c)(5)(iii)(B), 71.6(c)(5)(iii)(B). Section 113(c)(2) creates criminal liability for "[a]ny person who knowingly ... makes any false material statement, representation, or certification in, or omits material information from, or knowingly alters, conceals, or fails to file or maintain any notice, application, record, report, plan, or other document required pursuant to this chapter." 42 U.S.C. § 7413(c)(2).
 
 
 17
 During the rule making period in issue, EPA separately promulgated another rule, the Credible Evidence Rule ("CER"), which provides that nothing shall preclude the use of any credible evidence or information in demonstrating compliance or noncompliance with national emission standards. See 40 C.F.R. §§ 52.12(c); 60.11(g); 61.12(e). The preamble to the CER reconfirmed that credible evidence may be used in permit enforcement actions and compliance certifications. See Credible Evidence Revisions, 62 Fed. Reg. 8314, 8316-17 (1997). However, EPA further stated that the "revisions do not call for the creation or submission of any new emissions or parametric data, but rather address the role of existing data in enforcement actions and compliance certifications" and that the agency "in no way intends to alter the underlying emission standards." Id. at 8316; see also 62 Fed. Reg. at 8314-15.
 
 
 18
 Industry groups, led by Appalachian Power Company ("Appalachian"), challenge the "any other material information" requirement as beyond EPA's authority and as a violation of their due process rights.
 
 II. NRDC Challenge
 
 19
 Both NRDC and the industrial challengers petitioned this court for a review of EPA's actions pursuant to 42 U.S.C. § 7607(b)(1), which provides that all challenges to nationally applicable regulations under the Clean Air Act must be brought in the United States Court of Appeals for the District of Columbia Circuit. After exercising this jurisdiction under applicable legal standards, we conclude that with one exception the challenges either are not justiciable or do not warrant judicial relief.
 
 A. Enhanced Monitoring
 
 20
 NRDC challenges the adequacy of EPA's CAM program to meet the enhanced monitoring requirements of the Clean Air Act Amendments on multiple grounds. NRDC first asserts that CAM does not substantively comply with § 114(a)(3)'s enhanced monitoring mandate. Specifically, NRDC contends that CAM exempts so many major sources from its coverage that its lack of coverage should invalidate the rule. Further, NRDC argues that CAM's "reasonable assurance of compliance" standard does not assure compliance as required by the Clean Air Act or assure compliance as a factual matter. In addition, NRDC claims that the length of CAM's phase-in period creates an unreasonable delay. Finally, NRDC asserts that EPA's requirement that a major source certify only whether its report is based on "continuous or intermittent data," 40 C.F.R. § 70.6(c)(5)(iii)(B) (emphasis added), does not meet the Clean Air Act's explicit requirement that "[c]ompliance certifications shall include ... whether compliance is continuous or intermittent," 42 U.S.C. § 7414(a)(3) (emphasis added). We conclude that only the last challenge merits relief.
 
 
 21
 NRDC's challenge to EPA's adoption of CAM in furtherance of the "enhanced monitoring" requirement of § 114(a)(3) questions the interpretation of a statute by the agency entrusted with the administration of that statute. Therefore, we apply the classic two-step test of Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), which provides that in such review we first look to the statute's language and give effect to any "unambiguously expressed intent of Congress," but if the statute is ambiguous or silent with regard to the matter at issue, we accept the agency's interpretation, provided that interpretation is merely reasonable. Id. at 842-43, 845. The phrase "enhanced monitoring" as used in § 114(a)(3) is sufficiently ambiguous to invoke the second step of the Chevron analysis. As EPA pointed out, section 114(a)(3) does not specify any particular type of enhanced monitoring. Nothing in the phrase "enhanced monitoring" supports NRDC's view that only continuous or direct emissions monitoring can be regarded as "enhanced" or that CAM cannot be deemed "enhanced." Nonetheless, NRDC argues that CAM cannot constitute "enhanced monitoring" since it exempts numerous sources from its coverage, does not assure "sufficiently reliable" compliance as required by § 504(b), and does not in fact provide even a "reasonable assurance of compliance."We reject these arguments for several reasons.
 
 
 22
 First, CAM is not invalid on the basis that it does not cover certain major sources (e.g., those that do not utilize emission control devices and those that fail the 100-tons-per-emission point test). True, § 114(a)(3) plainly subjects all major sources to enhanced monitoring and, as NRDC points out, EPA exempts many major sources from CAM's coverage. However, the 1990 Clean Air Act Amendments did not mandate that EPA fit all enhanced monitoring under one rule and EPA has reasonably illustrated how its enhanced monitoring program, when considered in its entirety, complies with § 114(a)(3). Cf. NRDC v. EPA, 22 F.3d 1125, 1141-42 (D.C. Cir. 1994) (finding EPA's explanation for excepting certain areas from coverage under a particular rule reasonable given statute's broad mandate and EPA's overall regulatory plan).Specifically, EPA demonstrated that many of the major stationary sources exempt from CAM are subject to other specific rules, and if they are not, they are subject to the following two residual rules: (1)"[The permit shall contain] periodic monitoring sufficient to yield reliable data ... that are representative of the source's compliance with the permit...." 40 C.F.R. § 70.6(a)(3)(i)(B); (2) "All part 70 permits shall contain the following elements with respect to compliance: (1) Consistent with paragraph (a)(3) of this section, compliance certification, testing, [and] monitoring ... requirements sufficient to assure compliance with the terms and conditions of the permit." Id. § 70.6(c)(1).
 
 
 23
 While the Part 70 rules are not as specific as CAM, they have the same bottom line--a major source must undertake "monitoring ... sufficient to assure compliance." Like CAM, the monitoring protocols will be developed on a unit-by-unit basis. Such monitoring is sufficiently "enhanced" over the pre-1990 situation to satisfy the statutory requirement. See Compliance Assurance Monitoring, 62 Fed. Reg. 54,900, 54,904 (1997).
 
 
 24
 Second, EPA provides a reasonable basis for its conclusion that CAM will be effective in assuring emissions limit compliance. NRDC contends that there is no across-the-board evidence that monitoring control parameters will assure compliance and that EPA does not require control parameters to be statistically correlated with actual emissions standards.
 
 
 25
 We will not set aside a final rule under the Clean Air Act unless the underlying agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 42 U.S.C. § 7607(d)(9)(A) & (C). The "arbitrary and capricious" standard deems the agency action presumptively valid provided the action meets a minimum rationality standard. See, e.g., Small Refiner Lead Phase-Down Task Force v. EPA, 705 F.2d 506, 520-21 (D.C. Cir. 1983). In applying this standard we determine whether the agency has considered the relevant factors and articulated a rational connection between the facts and its choices. See Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). While we carefully review the factual record, we will give due deference to the agency especially when the agency action involves evaluating complex scientific or statistical data within the agency's expertise. See Ethyl Corp. v. EPA, 541 F.2d 1, 34-36 (D.C. Cir. 1976) (en banc).
 
 
 26
 Applying that standard of review to the rule before us, we conclude that EPA's adoption of CAM survives NRDC's challenge. As EPA argues, across-the-board evidence is unnecessary since CAM requires major source owners, on a unit-by-unit basis, to "establish ... appropriate range(s) ... for the selected indicator(s) such that operation within the ranges provides a reasonable assurance of ongoing compliance with emission limitations." 40 C.F.R. § 64.3(a)(2).Thus, CAM enhances monitoring by requiring each major source owner to design a site-specific monitoring system sufficient to provide a reasonable assurance of compliance with emissions standards. See id. § 64.3(a), (a)(2). Moreover, as EPA made clear at oral argument, this standard does require a major source owner to establish a correlation between the control parameters and emission limits. We cannot therefore conclude that the EPA has failed to consider relevant factors or articulate a rational connection between the facts and its choices. For the same reasons, we conclude CAM satisfies the "sufficiently reliable" compliance requirement of § 504(b). We therefore apply the statutorily mandated deference to the agency's judgment and deny the NRDC's challenge.
 
 
 27
 Third, NRDC misconstrues § 114(a)(1)(D)-(E) as requiring EPA to mandate direct enhanced monitoring of major sources unless EPA finds such monitoring "impractical." We agree with EPA that CAM was promulgated under subsection (a)(3) of § 114 rather than under subsection (a)(1). Section 114(a)(1) gives EPA the option to require ("the Administrator may require") certain kinds of monitoring whereas § 114(a)(3) squarely requires enhanced monitoring ("the Administrator shall ... require enhanced monitoring"). Since CAM falls into the required enhanced monitoring category and § 114(a)(3) does not contain language requiring an impracticality finding, EPA did not have to make an impracticality finding before choosing to monitor major source control parameters rather than to monitor emissions directly.
 
 
 28
 Finally, NRDC erroneously believes that CAM does not effectuate the congressional intent behind the 1990 Clean Air Act Amendments because CAM fails to "facilitate" enforcement. See S. Rep. No. 101-228, at 368 (1989). NRDC argues that since CAM monitoring data do not establish source compliance or noncompliance, the data lack the value necessary to be used as probative evidence in enforcement proceedings. However, as we stated before, EPA reasonably concluded that CAM will provide a reasonable assurance of compliance with emissions limitations. Thus, EPA "facilitates" enforcement under any reasonable definition of the term since CAM monitoring provides evidence that will be relevant in any enforcement action.
 
 
 29
 In sum, we hold that EPA's adoption of CAM as "enhanced monitoring" meets the requirements of the Clean Air Act.
 
 B. CAM Phase-In
 
 30
 EPA's decision to phase in the CAM requirements as major source permits are renewed is reasonable. EPA acknowledges that some major sources applying for permits will come under CAM's coverage over the next two to three years while some sources will not be phased-in for approximately five to eight years because CAM requirements will not apply to them until their next permit renewal. See 40 C.F.R. § 70.4(b)(3)(iii), (iv) (stating that permits are renewed or reviewed every five years). However, EPA reasonably decided to phase-in CAM requirements based on the already existing licensing structure in order to lessen the burden on sources and state licensing authorities and to create a learning-curve for implementation. See 62 Fed. Reg. 54,90203, 54,927-28 (1997). Nor does NRDC point to a compulsory implementation deadline or offer a basis for second-guessing the agency at this point in time. See NRDC, 22 F.3d at 113740 (implying deference to the agency regarding implementation when statute silent regarding implementation deadline).Given the circumstances, EPA offers a reasonable explanation for the extended phase-in plan.
 
 C. Continuous or Intermittent Compliance
 
 31
 Despite CAM's validity, we hold that EPA's certification regulations are inconsistent in one particular with § 114(a)(3)(D)'s statutory mandate. While § 114(a)(3) clearly states that a major source's "compliance certification shall include ... whether compliance is continuous or intermittent[,]" EPA only requires that a major source's compliance certification include "[t]he identification of the method(s) ... used by the owner ... for determining the compliance status ... and whether such methods ... provide continuous or intermittent data." 40 C.F.R. §§ 70.6(c)(5)(iii)(B), 71.6(c)(5)(iii)(B). The statute requires that certification include whether "compliance"--not just "data"--is continuous or intermittent.
 
 
 32
 Although EPA may permit owners to certify compliance within the degree of certainty that CAM provides, it may not eliminate the "check off" requirement altogether. We do not reach the second step of the Chevron analysis on this question. Where Congress has expressed its unmistakable intent in the plain words of the statute, our review ends with step one. See Nuclear Information Resource Service v. Nuclear Regulatory Commission, 969 F.2d 1169, 1173 (D.C. Cir. 1992) (en banc). It will not save EPA's failure to meet the statutory requirement that there is ambiguity in other sections of the statute. It is only where "the statute ... is 'silent or ambiguous with respect to the specific issue' before us" that "we 'defer to the agency's interpretation of the statute.' " Id. (quoting Chemical Manufacturers Ass'n v. EPA, 919 F.2d 158, 162-63 (D.C. Cir. 1990)). Here, Congress expressly and unambiguously required that the certification include "whether compliance is continuous or intermittent."EPA's regulations do not effectuate that expressed mandate of the statute and must be remanded.
 
 III. Industry Groups' Challenge
 
 33
 Industry groups challenge EPA's requirement that compliance certifications be based on "any other material information," including "credible evidence," as impermissibly increasing the stringency of emissions standards. We, as we have before, conclude that the industry groups' challenge is unripe for review.
 
 
 34
 In Clean Air Implementation Project v. EPA, 150 F.3d 1200 (D.C. Cir. 1998) ("CAIP"), various industry groups challenged EPA's "credible evidence" rule revisions by alleging that the changes effectively increased the stringency of the underlying emissions standards contrary to proper rule making procedures. See id. at 1201, 1203. We held that, absent any demonstrable "great hardship," the industry groups' stringency challenge would be unripe for review until EPA actually brought a "credible evidence" enforcement proceeding against a source. Id. at 1205.
 
 
 35
 The industry groups here, led by Appalachian, contend that CAIP's ripeness analysis is not applicable to the present challenge because, unlike in that case, delaying a decision here will cause hardship to source owners. They argue that a hardship will occur because in being required to use "other material information" in their certifications, source owners will be required to "abandon any rights they might have to defend against the use of that evidence in enforcement proceedings." Appalachian Br. at 15. Whatever the merits of that argument might otherwise be, it does not appear that its factual underpinnings are sound in the present controversy. That is, it is not apparent that source owners will be required to abandon any such right.
 
 
 36
 At oral argument, EPA counsel agreed with the court's supposition that nothing precludes an owner from adding a caveat to its certification to the effect that, while it is providing other evidence which EPA might find material, the submitter disputes its materiality and reserves the right to challenge the use of the evidence in court. Counsel for Appalachian then agreed that the ability to use such disclaimer language "solves our problem." We agree. In other words, Appalachian's challenge on this ground is still not ripe.
 
 
 37
 In attacking the information requirement, Appalachian also argues that "any other information" and "credible evidence" as employed by EPA are such facially vague terms as to violate the due process rights of the regulated entities. Appalachian's void-for-vagueness attack also fails due to ripeness considerations. Specifically, since Appalachian does not contend that the "any other material information" rule is vague in every circumstance, its facial challenge collapses and it must wait until there is an actual enforcement proceeding to make a specific challenge that will be ripe. Cf. CAIP, 150 F.3d at 1205-06.
 
 Conclusion
 
 38
 To recap, we hold that CAM complies with the Clean Air Act's "enhanced monitoring" requirement, EPA supplied a reasonable basis for the CAM phase-in schedule, and the industry groups' challenge to EPA's "credible evidence" and "other material information" requirements is unripe for review.
 
 
 39
 Each major source must, however, certify whether its compliance is "continuous or intermittent." We therefore remand the portion of CAM pertaining to "continuous or intermittent" compliance certification to EPA for it to revise its regulation to accord with our decision, but affirm EPA in all other respects.
 
 
 40
 So ordered.