# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 12, 2013           Decided May 28, 2013

No. 12-1129

ASSOCIATION OF BATTERY RECYCLERS, INC., ET AL.,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY AND LISA PEREZ
JACKSON,
RESPONDENTS

RSR CORPORATION, ET AL.,
INTERVENORS

———

Consolidated with 12-1130, 12-1134, 12-1135

———

On Consolidated Petitions for Review of Final Action of
the United States Environmental Protection Agency

———

*Mark W. DeLaquil* argued the cause for Industry-Petitioners/Industry Respondent-Intervenors. With him on the briefs were *Robert N. Steinwurtzel*, *Thomas E. Hogan*, *Timothy J. Fitzgibbon*, *Bernard F. Hawkins Jr.*, *Clarence Davis*, *Newman Jackson Smith*, and *Dennis Lane*.

*Emma C. Cheuse* argued the cause for Environmental Petitioners/Environmental Respondent-Intervenors. With her on the briefs were *James S. Pew* and *Avinash Kar*.

*Timothy D. Backstrom* argued the cause for intervenor RSR Corporation. With him on the brief was *Lynn L. Bergeson*.

*Angeline Purdy*, Attorney, U.S. Department of Justice, argued the cause for respondents. With her on the brief was *Steven Silverman*, Attorney, U.S. Environmental Protection Agency.

Before: TATEL, *Circuit Judge*, and SILBERMAN and SENTELLE, *Senior Circuit Judges*.

Opinion for the Court filed PER CURIAM.

Concurring opinion filed by *Senior Circuit Judge* SILBERMAN.

PER CURIAM: In this case we consider challenges to EPA's revised emissions standards for secondary lead smelting facilities. Finding petitioners' claims unpersuasive, foreclosed by Circuit precedent, or otherwise barred from review, we deny in part and dismiss in part the petitions for review.

## I.

Section 112 of the Clean Air Act requires EPA to promulgate emissions standards for major sources of hazardous air pollutants ("HAPs"). 42 U.S.C. § 7412(d)(1). To do so, EPA calculates the "maximum achievable control technology" or "MACT," a process that occurs in two stages. First, under CAA section 112(d)(3), EPA sets what it calls the

"MACT floor"—certain minimum stringency requirements based on the amount of emissions reduction achieved in practice by the best performing sources. *Id.* § 7412(d)(3). Second, under section 112(d)(2), EPA "determines whether stricter standards, known as 'beyond-the-floor' limits, are achievable in light of the factors listed in [that provision]." *Cement Kiln Recycling Coalition v. EPA*, 255 F.3d 855, 858 (D.C. Cir. 2001) (per curiam); *see* 42 U.S.C. § 7412(d)(2).

Section 112(d)(6) requires EPA to "review, and revise as necessary (taking into account developments in practices, processes, and control technologies)" the emissions standards promulgated under section 112. 42 U.S.C. § 7412(d)(6). Section 112(f)(2) also requires EPA to review emissions standards to "consider whether residual risks [to public health or the environment] remain that warrant more stringent standards than achieved through MACT." *Sierra Club v. EPA*, 353 F.3d 976, 980 (D.C. Cir. 2004); *see* 42 U.S.C. § 7412(f)(2)(A).

In 2012, acting pursuant to sections 112(d)(6) and 112(f)(2), EPA revised the 1995 emissions standards for secondary lead smelting facilities, reducing allowable emissions by 90%—from the 2.0 milligrams per dry standard cubic meter (mg/dscm) previously permitted to 0.2 mg/dscm—and requiring smelters to totally enclose certain "fugitive" emission sources. *See National Emissions Standards for Hazardous Air Pollutants from Secondary Lead Smelting* ("Secondary Lead Rule"), 77 Fed. Reg. 556, 559, 564 (Jan. 5, 2012). Several industry groups and environmental groups filed petitions for review. Environmental and industry petitioners intervened as respondents in one another's cases, and RSR Corporation intervened both as a petitioner and as a respondent.

## II.

Industry petitioners first argue that the Secondary Lead Rule impermissibly regulates elemental lead as a HAP. Although EPA must regulate *lead compounds* as a HAP, *see* 42 U.S.C. § 7412(b)(1), the Clean Air Act prohibits EPA from listing or "in effect treat[ing]" *elemental lead*—or any criteria pollutant for which national ambient air quality standards ("NAAQS") are promulgated—as a HAP under section 112, *National Lime Association v. EPA*, 233 F.3d 625, 638 (D.C. Cir. 2000); *see also* 42 U.S.C. § 7412(b)(2) ("No [criteria pollutant] may be added to the list under this section . . . ."); *id.* § 7412(b)(7) ("The Administrator may not list elemental lead as a hazardous air pollutant under this subsection."). Petitioners claim that the Rule violates this prohibition by (1) specifying a testing method that measures the mass of elemental lead (rather than the mass of lead compounds) in a source's emissions; and (2) setting HAP emissions standards at levels designed to attain the primary lead NAAQS. As counsel for industry petitioners conceded at oral argument, *see* Oral Arg. Rec. 1:07:17–1:07:53, the first contention is time-barred because the 1995 emissions standards employed an identical testing method (Method 12) and that approach was not challenged in court at that time. *See National Emission Standards for Hazardous Air Pollutants from Secondary Lead Smelting*, 60 Fed. Reg. 32,587, 32,589 (June 23, 1995); 42 U.S.C. § 7607(b)(1) (requiring that any petition for review be filed within sixty days of publication in the Federal Register). The second contention also fails because the Rule sets HAP emissions standards at levels designed to attain the primary lead NAAQS, not the converse. The Rule in no way alters the NAAQS itself: it does not change the NAAQS level, impose an earlier NAAQS attainment date, or modify state implementation plans.

Industry petitioners next make a related argument that because the Secondary Lead Rule "measure[s] lead compounds by reference to their elemental lead content and toxicity"—the same methodology they claim is used to measure elemental lead in the prevention of significant deterioration ("PSD") program—regulation of these substances under the PSD program is duplicative and unlawful. Industry Petitioners' Br. 30; *see* 42 U.S.C. § 7412(b)(6) (providing that PSD program shall not apply to HAPs listed under section 112). But we lack jurisdiction to consider this argument because EPA took no action with respect to the PSD program in this rulemaking.

Next, industry petitioners challenge EPA's methodology for estimating fugitive emissions at secondary lead smelting facilities and EPA's reliance on these estimates to conclude that total enclosure of fugitive emission sources was warranted. As EPA points out, however, industry petitioners "suggested in comments that any error in EPA's methodology resulted in an *underestimation* of emissions from completely unenclosed facilities." Respondents' Br. 52. Thus, even if industry petitioners were correct, given that emissions from such facilities drove EPA's finding of unacceptable risk, they would "have done no more than show that the record even more fully supports the enclosure standard." Respondents' Br. 53. Accordingly, petitioners lack standing to press this claim because they have failed to show that, absent the alleged methodological error, " 'there is a substantial probability that they would not be injured and that, if the court affords the relief requested, the injury will be removed.' " *Coalition for Responsible Regulation, Inc. v. EPA*, 684 F.3d 102, 146 (D.C. Cir. 2012) (per curiam) (quoting *Chamber of Commerce v. EPA*, 642 F.3d 192, 201 (D.C. Cir. 2011)).

Industry petitioners' challenge to the Rule's requirement of lead continuous emissions monitoring systems ("CEMS") fares no better. To begin with, any claim that the CEMS requirement is arbitrary and capricious is premature. EPA has yet to promulgate performance specifications for CEMS and, until it does, smelters have no obligation to install CEMS. *See* 40 C.F.R. § 63.548(l)(1) (requiring sources to install a lead CEMS "within 180 days" of promulgation of performance specifications). As petitioners themselves recognize, "without a [performance] specification it is impossible to determine whether lead CEMS will function appropriately in secondary lead smelters" or to ascertain "accurate cost information for the installation and operation of lead CEMS." Industry Petitioners' Br. 22, 23. This court would thus clearly "benefit from further factual development of the issues" in connection with the performance specification rulemaking. *Ohio Forestry Association, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998). With respect to petitioners' procedural claim that the proposed rule referred to no "data in the record supporting the feasibility and cost-effectiveness of lead CEMS that would allow for meaningful public comment," Industry Petitioners' Br. 23; *see* 42 U.S.C. § 7607(d)(3), EPA counsel assured us at oral argument that stakeholders will have the opportunity to challenge—and that EPA will reconsider imposing—the CEMS requirement itself in connection with the performance specification rulemaking, and counsel for industry petitioners agreed that this resolves their concern, *see* Oral Arg. Rec. 47:41–48:48, 1:06:45–1:06:55.

We also reject industry petitioners' contention that EPA's refusal to consider granting existing sources up to three years to comply with the revised emissions standards under CAA section 112(i)(3) was arbitrary and capricious. *See* 42 U.S.C. § 7412(i)(3) (authorizing the Administrator to grant existing sources up to three years for compliance with emissions

standards). EPA concluded that section 112(f)(4), which permits it to grant a waiver of no more than two years for compliance, *see id.* § 7412(f)(4), instead provided the governing framework for emissions standards promulgated under section 112(f), like those at issue here. This interpretation comports with the statute's unambiguous language. Although section 112(i)(3)'s three-year maximum compliance period applies generally to "any emissions standard . . . promulgated under [section 112]," *id.* § 7412(i)(3), section 112(f)(4)'s two-year maximum applies more specifically to standards "under this subsection," i.e., section 112(f), *id.* § 7412(f)(4). It is a well-established principle of statutory construction that " '[g]eneral language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment.' " *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2071 (2012) (alteration in original) (quoting *D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932)). Because Congress clearly intended to grant existing sources no more than two years to comply with standards promulgated under section 112(f), that is the end of the matter. *See Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 842 (1984).

Equally without merit is industry petitioners' claim that EPA's decision to revise emissions standards under section 112(d)(6) was arbitrary and capricious. Although petitioners contend that EPA failed to consider public health objectives or other controls imposed on emissions sources in determining whether more stringent standards were "necessary," nothing in section 112(d)(6)'s text suggests that EPA must consider such factors. To the contrary, the statute directs EPA to "tak[e] into account developments in practices, processes, and control technologies," 42 U.S.C. § 7412(d)(6),

not public health objectives or risk reduction achieved by additional controls.

## III.

We turn next to environmental petitioners' challenge and begin with Article III standing. Contrary to industry intervenors' claim, environmental petitioners have shown that their members "would have standing under Article III to sue in [their] own right," as required to establish associational standing. *NRDC v. EPA*, 489 F.3d 1364, 1370 (D.C. Cir. 2007). Several members aver that they live or work in close proximity to smelters and have reduced their time outdoors in response to concerns about pollution—precisely the kinds of harms the Supreme Court has deemed sufficient to show injury in fact. *See Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 183 (2000) ("[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened by the challenged activity.' " (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972))); Theresa Cano Decl. ¶¶ 3, 13–15; Michael Mullen Decl. ¶¶ 3, 5–7; Thad Carlson Decl. ¶¶ 3–4, 6–7; Jennifer McLellan Decl. ¶¶ 3–6. Moreover, were we to require EPA "to regulate the HAPs to which [their] members are exposed more stringently than the agency has already purported to do," as petitioners ask, this alleged injury would likely be redressed. *Sierra Club v. EPA*, 699 F.3d 530, 533 (D.C. Cir. 2012).

Environmental petitioners' challenge, however, fails on the merits. Their primary argument is that, when EPA revises emissions standards under section 112(d)(6), it must recalculate the maximum achievable control technology in accordance with sections 112(d)(2) and (d)(3). This argument, although far better developed than the identical claim in

*NRDC v. EPA*, 529 F.3d 1077 (D.C. Cir. 2008), is barred by that decision. There, we explained that section 112(d)(6) could not "be construed reasonably as imposing" an obligation on EPA "to completely recalculate the maximum achievable control technology" when it revises standards under that provision. *Id.* at 1084. Seeking to dismiss that statement as dictum, environmental petitioners argue that the *NRDC* panel had no occasion to decide the legal test applicable to a section 112(d)(6) revision because EPA, having found "no 'significant developments in practices, processes, and control technologies,' " never promulgated revised standards in that rulemaking. *Id.* (quoting *National Emission Standards for Organic Hazardous Air Pollutants From the Synthetic Organic Chemical Manufacturing Industry*, 71 Fed. Reg. 76,603, 76,605 (Dec. 21, 2006)). But the panel rested its decision on two independent conclusions: that section 112(d)(6) imposes no obligation to recalculate the MACT and that "[e]ven if the statute did impose such an obligation, petitioners have not identified any post-1994 technological innovations that EPA has overlooked." *Id.* Where, as in that case, "there are two grounds, upon either of which an appellate court may rest its decision, and it adopts both, 'the ruling on neither is obiter [dictum], but each is the judgment of the court, and of equal validity with the other.' " *United States v. Title Insurance & Trust Co.*, 265 U.S. 472, 486 (1924) (quoting *Union Pacific Railroad Co. v. Mason City & Fort Dodge Railroad Co.*, 199 U.S. 160, 166 (1905)).

Environmental petitioners next argue that EPA impermissibly considered cost in revising emissions standards under section 112(d)(6). But the statute only bars cost consideration in setting MACT floors under section 112(d)(3), *see National Lime*, 233 F.3d at 640; section 112(d)(2) in contrast expressly *directs* EPA to consider costs when setting beyond-the-floor standards, *see* 42 U.S.C. § 7412(d)(2)

(directing the Administrator to "tak[e] into consideration the cost of achieving . . . emission reduction"). Petitioners are correct that section 112(d)(6) itself makes no reference to cost and that the Supreme Court has "refused to find implicit in ambiguous sections of the [Clean Air Act] an authorization to consider costs that has elsewhere, and so often, been expressly granted." *Whitman v. American Trucking Associations, Inc.*, 531 U.S. 457, 467 (2001). But given that EPA has no obligation to recalculate the MACT floor when revising standards, *see supra* at 8–9, and given that section 112(d)(2) expressly authorizes cost consideration in other aspects of the standard-setting process, we believe this clear statement rule is satisfied.

Finally, environmental petitioners have failed to show that EPA acted arbitrarily and capriciously when it decided not to impose more stringent emissions standards based on certain technological developments—namely, high efficiency particulate air ("HEPA") filters and wet electrostatic precipitators ("WESP"). EPA reasonably explained that further reductions were unwarranted due to concerns about the feasibility, utility, cost-effectiveness, and adverse collateral environmental impacts associated with this technology, and petitioners point to no "clear error of judgment" reflected in this reasoning. *Defenders of Wildlife v. Salazar*, 651 F.3d 112, 116 (D.C. Cir. 2011).

## IV.

With the exception of RSR's challenge to the CEMS requirement, which we reject for the same reasons as industry petitioners' identical claim, *see supra* at 6, RSR challenges only EPA's failure to require that more stringent standards be imposed on the company's competitors. According to industry intervenors, RSR lacks prudential standing to bring those claims. *See In re Vitamins Antitrust Class Actions*, 215 F.3d

26, 29 (D.C. Cir. 2000) (explaining that potential intervenors must demonstrate prudential standing). Because this Circuit treats prudential standing as "a jurisdictional issue which cannot be waived or conceded," *Animal Legal Defense Fund, Inc. v. Espy*, 29 F.3d 720, 723 n.2 (D.C. Cir. 1994); *see also Grocery Manufacturers Association v. EPA*, 693 F.3d 169, 174, 179 (D.C. Cir. 2012), we must consider this argument even though it was raised only by industry intervenors, *see U.S. Telephone Association v. FCC*, 188 F.3d 521, 531 (D.C. Cir. 1999) (explaining the general "rule against consideration of issues raised by intervenors and not by petitioners"). Under our case law, RSR lacks prudential standing because an industry group's interest in "increasing the regulatory burden on others" falls outside the "zone of interests" protected by the Clean Air Act. *Cement Kiln*, 255 F.3d at 870–71. RSR nonetheless insists that it has prudential standing because it "is regulated by the very standards it is challenging." RSR Petitioner-Intervenor Reply Br. 5. But apart from the CEMS requirement, RSR objects not to any regulatory burden imposed on it but instead to the absence of regulatory burdens imposed on its competitors.

## V.

For the foregoing reasons, the petitions for review are denied in part and dismissed in part.

*So ordered.*

SILBERMAN, *Senior Circuit Judge*, concurring: I concur fully in the Court's opinion. I write separately to explain more completely why it is appropriate for us to hold that intervenor RSR Corporation lacks prudential standing.

Though RSR is in the unusual position of intervening as both a petitioner and respondent, nearly all of its substantive arguments overlap with those made by the environmental petitioners. But unlike the environmental petitioners, RSR's only interest in this dispute is increasing the regulatory burden on its competitors, and as the Court explains, Op. at 10-11, it is well-established that such an interest does not suffice to show prudential standing. *Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 871 (D.C. Cir. 2001).

The EPA has not itself argued that RSR lacks prudential standing, and while the industry group has raised the issue, they did so only in their brief as respondent-intervenors, not as petitioners. The general rule in this circuit is that "[i]ntervenors may only argue issues that have been raised by the principal parties." *Nat'l Ass'n of Regulatory Util. Comm'rs v. ICC*, 41 F.3d 721, 729 (D.C. Cir. 1994). Were our consideration of prudential standing dependent on the parties themselves having raised this issue, we might face the thorny question of how to apply our general rule where an issue is raised by the same entity that is a party, but only in that entity's separate capacity as intervenor.

We were not required to address that question here, however, because we treat prudential standing as a jurisdictional limit that cannot be waived. *See Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 174, 179 (D.C. Cir. 2012) (considering prudential standing where not raised by the parties);[1] *Animal Legal Def.*

---

[1] The industry group characterizes the rule from *Grocery Manufacturers* as stating that "[t]his Court considers prudential standing arguments raised by Respondent-Intervenors, even where

*Fund, Inc. v. Espy*, 29 F.3d 720, 723 n.2 (D.C. Cir. 1994) ("Standing, whether constitutional or prudential, is a jurisdictional issue which cannot be waived or conceded."). That would normally be the end of the matter, except that the validity of our precedent on this point was recently called into question by a thoughtful dissent in *Grocery Manufacturers*. *See* 693 F.3d at 183-85 (Kavanaugh, J., dissenting).

Judge Kavanaugh acknowledged that "older cases from this Court said that prudential standing was jurisdictional." *Id.* at 185 n.4 (citing *Animal Legal Def. Fund*, 29 F.3d at 723 n.2); *see also Steffan v. Perry*, 41 F.3d 677, 697 (D.C. Cir. 1994) (en banc). But he argued that these decisions were inconsistent with more recent Supreme Court decisions that have "significantly tightened and focused the analysis governing when a statutory requirement is jurisdictional." *Grocery Mfrs.*, 693 F.3d at 183-84 (Kavanaugh, J., dissenting) (citing *Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237, 1243 (2010)). He further observed that other circuits have found prudential standing to be non-jurisdictional (and therefore waivable), *id.* at 184-85 (collecting cases), and he also cited post-1994 cases in this circuit at least suggesting that prudential standing is not jurisdictional, *id.* at 185 n.4 (collecting cases).

---

[respondent] does not raise the objection." But *Grocery Manufacturers* does not say that prudential standing has any special relationship to the rule about arguments raised only by intervenors. Rather, it stands for the general principle that the zone-of-interests test is jurisdictional, and therefore must be considered by the court even when not raised by the parties.

But a majority[2] of the *Grocery Manufacturers* panel concluded that one of the petitioners in that case lacked prudential standing (even though the EPA had not raised the issue), and a petition for rehearing en banc was subsequently denied — without any published rebuttal from active judges to Judge Kavanaugh's dissent from the order denying rehearing. 704 F.3d 1005 (D.C. Cir. 2013).

I take this opportunity to respond. First, it should be noted that the term "prudential standing" is a misnomer — at least in the context of whether a plaintiff (or petitioner) in an APA cause of action is within the "zone of interests" of the relevant substantive statute. There are other kinds of standing issues, like third-party standing, that do spring from concepts of jurisdictional prudence. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 804 (1985). But as the Supreme Court has recognized, what is involved in the zone-of-interest analysis is more properly described as "statutory standing." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 92, 97 (1998).

That characterization is sensible because this test — unlike other prudential standing inquiries — is a gloss on the APA's right of review for "[a] person . . . adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. *See Air Courier Conference of Am. v. Am. Postal Workers Union AFL-CIO*, 498 U.S. 517, 523-24 (1991) ("[T]he plaintiff must establish that the injury he

---

[2] Judge Tatel, writing separately, noted his agreement with those other circuits that found prudential standing non-jurisdictional, but also stated that "[t]his Circuit . . . has directly held to the contrary," and found that the language in Supreme Court decisions collected by the dissent was insufficient "to permit this panel to depart from our clear prior holdings." *Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 180 (D.C. Cir. 2012) (Tatel, J., concurring).

complains of (*his* aggrievement, or the adverse effect *upon him*), falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990)) (internal quotation marks omitted)); *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153-54 (1970) (connecting the zone-of-interests concept to the specific language of the APA). This particular type of prudential standing is thus typically tied to at least two statutes — the organic statute underlying a complaint and the APA itself.[3]

The question of whether a plaintiff has statutory standing therefore depends on Congressional intent — does Congress intend that this particular class of persons have a right to sue under this substantive statute? In that respect, statutory standing is similar to subject-matter jurisdiction, and this Court has even described it as such in a past case. *See Mallick v. Int'l Bhd. of Elec. Workers*, 749 F.2d 771, 772 n.1 (D.C. Cir. 1984) (finding that the plaintiff fell within the zone of interests, and therefore that "we have subject matter jurisdiction to decide this case"). In one instance, Congress is implicitly deciding who can sue, and in the other, what kind of cases can be brought. And of

---

[3] I recognize that the Supreme Court has applied the zone-of-interests test to at least one non-statutory cause of action. *See Bos. Stock Exch. v. State Tax Comm'n*, 429 U.S. 318, 320 (1977) (noting that plaintiffs "suffer[ed] an actual injury within the zone of interests protected by the Commerce Clause"). Perhaps the test is of a more prudential character in the constitutional context, or perhaps that decision was simply anomalous. Either way, when the zone-of-interests *is* applied for statutory causes of action (as is almost always the case), then it may properly be characterized as a question of statutory standing, for the reasons given above.

course, in both situations (unlike with Article III barriers) Congress can always change the law.

The significance as to whether statutory standing is labeled jurisdictional relates to two other questions. First, is a court obliged to consider statutory standing where the parties have not raised it, and second, can a court rely on statutory standing prior to consideration of an Article III issue? As to the first question, Supreme Court case law is unclear. But on the second question — the order in which issues may be considered — the Court has treated statutory standing like other jurisdictional thresholds. Normally a federal court must confront an Article III question at the outset of a case, but the Supreme Court has noted that a federal court may decide a statutory standing issue before reaching an Article III question, as would be true of a subject-matter jurisdiction issue. *Steel Co.*, 523 U.S. at 97 n.2 (defending the proposition that "a statutory standing question can be given priority over an Article III question"); *see also Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 353 n.4 (1984) (analyzing the interrelated concepts of preclusion of judicial review and statutory standing); *Grand Council of the Crees (of Quebec) v. FERC*, 198 F.3d 950, 954 (D.C. Cir. 2000) ("[I]t is entirely proper to consider whether there is prudential standing while leaving the question of constitutional standing in doubt, as there is no mandated 'sequencing of jurisdictional issues.'" (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999))). That suggests that the Court sees statutory standing as different from other species of what is generally called prudential standing — indeed having a characteristic of a jurisdictional issue.[4]

---

[4] To be sure, *Steel Co.* indicates that a merits question could be decided before a statutory standing issue because they are interrelated (i.e, is the plaintiff arguably within its zone of interest?), 523 U.S. at 97 n.2 (discussing "[t]he reasons for allowing merits questions to be

The Supreme Court has made statements *in dicta* that would appear to limit jurisdictional issues (besides Article III) to subject-matter and personal jurisdiction. *See, e.g.*, *Reed Elsevier*, 130 S. Ct. at 1243 ("[T]he term 'jurisdictional' properly applies only to 'prescriptions delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction)' implicating [a court's adjudicatory] authority." (quoting *Kontrick v. Ryan*, 540 U.S. 443, 455 (2004))). But the Court has never specifically held that prudential standing — much less *statutory* standing — is non-jurisdictional. *Id.*[5]

Most of the Courts of Appeals that have held prudential standing non-jurisdictional concerned only third-party standing, which really is a judge-made concept. *See Bd. of Miss. Levee Comm'rs v. EPA*, 674 F.3d 409, 417 (5th Cir. 2012) (treating as waived the EPA's argument that "the Board seeks to assert the legal rights of the Corps"); *Rawoof v. Texor Petroleum Co.*, 521 F.3d 750, 756 (7th Cir. 2008) (discussing the "prudential-standing limitation . . . principle that a litigant cannot sue in federal court to enforce the rights of third parties"); *Indep. Living Ctr. of S. Cal., Inc. v. Shewry*, 543 F.3d 1050, 1065 n.17 (9th Cir. 2008) (citing *Bd. of Natural Res. v. Brown*, 992 F.2d 937, 945-46 (9th Cir. 1993) ("[T]he rule against third-party standing is not a jurisdictional limitation on our review, but a prudential one.")) (noting only that the state agency had "fail[ed] to articulate any argument challenging ILC's prudential standing").

---

decided before statutory standing questions"). But that situation only occurs when the court *dismisses* a case on the merits.

[5] To confuse matters furthers, consider that personal jurisdiction — unlike Article III standing or subject-matter jurisdiction — may be waived. *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982).

As far as I am aware, only two courts have held specifically that the zone-of-interests test is non-jurisdictional, and they did not recognize or discuss any difference between statutory standing and prudential standing generally. *See Finstuen v. Crutcher*, 496 F.3d 1139, 1147 (10th Cir. 2007) ("Prudential standing requires, among other things, that 'a plaintiff's grievance . . . arguably fall[s] within the zone of interests protected or regulated by the statutory provision . . . invoked in the suit.'" (quoting *Bd. of Cnty. Comm'rs v. Geringer*, 297 F.3d 1108, 1112 (10th Cir. 2002))); *Gilda Indus., Inc. v. United States*, 446 F.3d 1271, 1280 (Fed. Cir. 2006) ("[W]e do not need to reach or decide the question whether Gilda satisfies the standing requirements of the Administrative Procedure Act, because the government did not contend in its brief that Gilda's complaint should be barred by the zone of interests test.").

In light of this confusing tangle of jurisprudential concepts — and especially in light of the apparent differences between statutory standing and other species of prudential standing — I think we ought to be especially hesitant to overturn past precedent on these issues until the Supreme Court has provided clear guidance.

In any event, even if we were not *required* to consider statutory standing *sua sponte*, we would still have the *authority* to do so under *U.S. National Bank of Oregon v. Independent Insurance Agents of America, Inc.*, 508 U.S. 439, 447 (1993) ("[A] court may consider an issue 'antecedent to . . . and ultimately dispositive of' the dispute before it, even an issue the parties fail to identify and brief." (quoting *Arcadia v. Ohio Power Co.*, 498 U.S. 73, 77 (1990))). Indeed, we relied on this very case as authority to decide a statutory standing issue that was purportedly waived in *Animal Legal Defense Fund, Inc. v. Espy*, 23 F.3d 496, 499 (D.C. Cir. 1994). So whether or not statutory standing remains a jurisdictional concept, there is

nothing improper about raising the issue ourselves where the parties do not.[6]

Finally, it is worth noting that this question — whether prudential standing should be raised by a federal court *sua sponte* — typically arises when the government neglects to raise the issue, which might be thought a rare occasion of litigation lapse. However, in both this case and *Grocery Manufacturers*, the Justice Department failed to do so, and in both cases, the government's position was defended by the Environmental Division. It would seem that this division — perhaps reflecting the political views of its major "client" (the EPA) — declines to raise standing issues available as a defense. That practice has led to some dramatic contrasts between positions taken by the Civil Division and the Environmental Division. Indeed, in one case some years ago, a lawyer for the Environmental Division *fainted* during oral argument while attempting to explain a different position on standing than one argued a few days before by a Civil Division lawyer.

The justification for the Justice Department's control over all executive branch litigation — a control that I, as a judge, think is even more important than I once thought as a Justice Department official — depends on its ability to ensure

___

[6] Prudential standing might therefore stand on the same footing as prudential ripeness. The Supreme Court has indicated that "ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Reno v. Catholic Soc. Servs.*, 509 U.S. 43, 57 n.18 (1993). Though the Court has indicated that *prudential* ripeness may be waived, *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758, 1767 n.2, it has also held that "even in a case raising only prudential concerns, the question of ripeness may be considered on a court's own motion." *Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 808 (2003).

uniformity and sophistication in government litigation. It hardly serves that end to allow one division of the Justice Department to subordinate a government-wide litigation interest to the desires of one agency.